THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: November 23, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Adlon Brand GmbH & Co. KG*
*c/o FUNDUS FONDS-Verwaltungen GmbH*

_____

Serial No. 85831682

_____

Jennifer Fraser of Dykema Gossett PLLC
    for Adlon Brand GmbH & Co. KG c/o FUNDUS FONDS-Verwaltungen GmbH.

N. Gretchen Ulrich, Trademark Examining Attorney, Law Office 113,
    Odette Bonnet, Managing Attorney.

_____

Before Quinn, Ritchie, and Masiello,
    Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

Adlon Brand GmbH & Co. KG c/o FUNDUS FONDS-Verwaltungen GmbH

("Applicant") filed an application to register on the Principal Register the mark

ADLON (in standard characters) for the following goods and services:

> Alcoholic beverages, except beers, in particular wine,
> sparkling wine, champagne, vodka, rum, brandy, liqueurs,
> in International Class 33;
>
> Entertainment of guests, namely, night club services;
> casinos; entertainment services, namely, providing leisure
> interest facilities in the nature of swimming pools and
> fitness gyms; personal trainer services; entertainment

services, namely, planning, arranging and conducting exhibitions, training sessions, seminars, congresses and conferences in the field of fashion shows and fashion events; publication of specialist periodicals, magazines, catalogues and books, in particular in the field of beverages, foodstuffs and catering; publication of specialist periodicals, magazines, catalogues and books, in particular in the field of beverages, foodstuffs and catering, or exclusive hotels; party planning services, in International Class 41;

Bar services; hospitality industry services, namely, provision of temporary housing accommodation, food and beverages; operation of bars; operation of restaurants, cafeterias and self-service restaurants, catering; hotel reservations for third parties; consulting services in the field of hospitality, in International Class 43; and

Hygienic and beauty care, namely, beauty salon, hair salon, medical spa services, namely, minimally and non-invasive cosmetic and body fitness therapies, health spa services for health and wellness of the body and spirit, namely, providing massage, facial and body treatment services, cosmetic body care services, weight loss programs; consulting services in the field of health; provision of sauna facilities; provision of solariums; massage services, in International 44.[1]

The Trademark Examining Attorney refused registration under Section 2(e)(4) of the Trademark Act, 15 U.S.C. § 1052(e)(4), on the ground that the mark is primarily merely a surname. When the refusal was made final, Applicant appealed and requested reconsideration. The Examining Attorney denied the request for reconsideration and this appeal proceeded. The appeal is fully briefed.

---

[1] Application Serial No. 85831682, filed January 24, 2013 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on an allegation of a *bona fide* intention to use the mark in commerce.

Section 2(e)(4) of Trademark Act precludes registration of a mark which is "primarily merely a surname" on the Principal Register without a showing of acquired distinctiveness under Section 2(f) of the Act, 15 U.S.C. § 1052(f).[2] "The test for determining whether a mark is primarily merely a surname is the primary significance of the mark as a whole to the purchasing public." *In re Hutchinson Tech. Inc.*, 852 F.2d 552, 7 USPQ2d 1490, 1492 (Fed. Cir. 1988). This expression of the test restates the rule set forth in *In re Kahan & Weisz Jewelry Mfg. Corp.*, 508 F.2d 831, 184 USPQ 421, 422 (CCPA 1975) ("[A] correct resolution of the issue can be made only after the primary significance of the mark to the purchasing public is determined …") and *In re Etablissements Darty et Fils*, 759 F.2d 15, 225 USPQ 652, 653 (Fed. Cir. 1985). In any evaluation of whether a proposed mark is primarily merely a surname, we consider evidence as to whether "it is also a word having ordinary language meaning" since "[t]he language meaning is likely to be the primary meaning to the public." *Etablissements Darty*, 225 USPQ at 653. We also consider – if there is evidence to so indicate – whether the public may perceive the mark to be primarily a meaningless, coined term. The Board's oft-cited "*Benthin* factors" are examples of inquiries that may lead to evidence regarding the purchasing public's perception of a term's primary significance. *In re Benthin Mgmt. GmbH*, 37 USPQ2d 1332, 1333-34 (TTAB 1995). However, rather than using these factors as guidelines, practitioners

---

[2] The statutory basis for the refusal requires not a mere determination whether the proposed mark *is* or *is not* a surname but, rather, whether it is *primarily merely* a surname.

and examining attorneys have often interpreted them with a rigidity that is not warranted.

In order to show that ADLON is, in fact, a surname, the Examining Attorney has submitted evidence from the websites <switchboard.com>, <411.com>, <ancestry.com>, <houseofnames.com>, and <lastnames.myheritage.com>.[3] To show that ADLON has no other apparent meaning, she has submitted "negative dictionary" evidence, that is, evidence showing that the term ADLON cannot be found in the dictionaries at <macmillandictionary.com>, <collinsdictionary.com>,[4] and <merriam-webster.com>;[5] and the result of an electronic "place name" search of THE COLUMBIA GAZETTEER OF THE WORLD, showing that ADLON does not appear therein.[6] Further, Applicant has stated that "The wording ADLON has no meaning in a foreign language."[7]

We agree with Applicant (and it is self-evident) that the listings in <switchboard.com> and <411.com> are in part duplicative; and that, of course, "the listings of the two separate searches should not be added together to increase the number of Adlon surnames."[8] Apart from the few duplicate entries specifically pointed out by Applicant, we note that there are some others. There are also a few individuals having Canadian addresses, which listings therefore should not be

---

[3] Office Action of November 14, 2013 at 8-67; Office Action of May 15, 2013 at 7-15.
[4] Office Action of November 14, 2013 at 107-110.
[5] Office Action of June 8, 2014 at 118.
[6] *Id.* at 121.
[7] Applicant's response of October 23, 2013. The Examining Attorney has not questioned Applicant's statement and there is no evidence to the contrary.
[8] Applicant's brief at 8, 29 TTABVUE 13.

considered: where all of the information we have regarding an individual is that he or she resides abroad, there is no basis for believing that members of the United States public have been exposed to the individual's surname.[9] Neither the Examining Attorney nor Applicant has attempted to tabulate the non-duplicative listings so as to propose to the Board an accurate count of relevant listings.

Applicant questions the objectivity and reliability of the Examining Attorney's evidence from genealogy websites, suggesting that the primary purpose of such sites is to sell consumers a family crest. We find that there is little information to be gleaned from this evidence. The references in <ancestry.com> to "2,089 Historical Documents and Family Trees with Adlon"; "668 Census and Voter Lists; 123 Immigration Records," *etc.*[10] are too vague to be useful in our analysis, as there is no information about the nature of these "documents" and "records" and we cannot know how many individuals named Adlon they refer to or whether such references are duplicative. The statement that "There are 85 people with the Adlon surname on MyHeritage.com"[11] is, at best, corroborative of the more reliable evidence in the telephone directory websites, as we have no way of knowing what it really means to be "on" the website. The accuracy and probative value of the evidence from

---

[9] While it is reasonable to infer that Canadians may easily cross into adjacent areas of the United States, or that U.S. residents may easily cross into Canada, we do not accord evidence of use of a proposed mark in Canada any greater probative value than evidence from other more distant countries. The Board's focus, with few exceptions, is on evidence of use of terms in the United States.

[10] Office Action of May 15, 2013 at 9.

[11] *Id.* at 14.

<houseofnames.com> is difficult to assess. We give little weight to the genealogy website evidence as presented in this case.[12]

Overall, the Examining Attorney's evidence is sufficient to show actual use of ADLON as a surname by approximately 75 individuals in the United States; and to show that there is no other apparent meaning of the term, either as a word or as a geographic place name. We find that the Examining Attorney has sufficiently demonstrated that ADLON is a surname, albeit a rare one. We turn next to consider whether the primary significance of the mark to the purchasing public would be that of a surname.

The Examining Attorney has submitted evidence from Facebook, Twitter, and LinkedIn relating to 8 individuals with the surname Adlon.[13] In addition, the Examining Attorney included information from the IMDb entertainment website concerning an actress named Pamela Adlon, who the website pages indicate has achieved a substantial degree of public recognition for her performances in live-action roles on the television shows "Californication" and "Louie," and "as a voice actress in …, most famously, -- 'King of the Hill' (1997) -- for which she [later] won an Emmy for her role as Bobby Hill."[14] The record contains other evidence of the public's exposure to Pamela Adlon in mainstream media in the form of articles in *The New*

---

[12] We do not intend to suggest that these websites cannot be effectively mined for probative evidence in other cases.

[13] Office Action of November 14, 2013 at 82-102.

[14] IMDb entry for "Pamela Adlon," *Id*. at 70-81. We note Applicant's suggestion that even a person who is familiar with the show "King of the Hill" might not have noticed the name of one of its voice actors. Applicant's brief at 9, fn.1, 29 TTABVUE 14.

*York Times*,[15] TV Guide online,[16] New York magazine online,[17] Huffington Post,[18] and <slate.com>;[19] an interview on the National Public Radio show "Fresh Air";[20] and an extensive entry in <tv.com>.[21] The Examining Attorney has also submitted evidence from the IMDb entertainment website mentioning other entertainers and artists bearing the surname "Adlon": actors Gideon, Louis, Randi, Odessa, and Rocky; director Percy; producer Eleonore; and writers Felix O. and Hedda.[22]

Applicant challenges the reliability of the Examining Attorney's evidence from IMDb, Twitter, Facebook, and other online media, saying that "there is no means for verifying that the information regarding the 'surname' (or account name) is correct."[23] However, it does not matter whether the information set forth is correct; what matters is that through these media the public has been exposed to the term ADLON as a surname. Applicant disparages the social network evidence as "websites where individuals have posted general details of their daily life including comments about the weather, classes, vacations and even comments of a sexually-charged nature."[24] Yet regardless of the nature of the content of these social network postings, they illustrate the ways in which members of the public may be exposed to people who bear the surname ADLON.

---

[15] Office Action of June 8, 2014 at 60-64.
[16] *Id.* at 65-66.
[17] *Id.* at 54-59.
[18] *Id.* at 67-72.
[19] *Id.* at 74-77.
[20] *Id.* at 43-47.
[21] *Id.* at 24-42.
[22] Office Action of November 14, 2013 at 60-69.
[23] Applicant's brief at 10, 29 TTABVUE 15.
[24] *Id.* at 10-11, 29 TTABVUE 15-16.

Applicant repeatedly refers to the small number of individuals named "Adlon" as shown by the Examining Attorney's evidence and compares it to the number of surname uses shown in other cases. "Thus, it appears likely the evidence shows fewer than 100 entries, and, in the past, fewer than 100 entries do not typically support such a refusal."[25] This strictly numerical approach to a surname analysis has been squarely rejected:

> [W]ith respect to issues of fact, no precedential value can be given to the quantum of evidence apparently accepted in a prior case. The quantum of evidence which was persuasive against finding surname significance in one case may be insufficient in another because of differences in the names themselves.

*Etablissements Darty*, 225 USPQ at 653.

Throughout its brief, Applicant emphasizes the importance of the "rareness" of the surname ADLON. Referring to the *Benthin* factors, Applicant argues, "The first factor [*i.e.*, rareness] demonstrates whether the mark is popular enough such that the second through fourth factors should be addressed to determine whether the mark will be perceived as primarily merely a surname."[26] However, there is no support for this "threshold" approach, either in the statute or in the standard of analysis set forth in *Kahan & Weisz*, *Hutchinson Technology* and *Etablissements Darty*. Elsewhere Applicant argues that the surname ADLON is not "prolific enough to rise to the level required to demonstrate [that it is] primarily merely a surname";[27] and that "the Examining Attorney has failed to produce sufficient evidence to establish a prima

---

[25] *Id.* at 8, 29 TTABVUE 13.
[26] *Id.* at 5, 29 TTABVUE 10.
[27] *Id.* at 8, 29 TTABVUE 13.

facie case that ADLON is not a rare surname."[28] Again, there is no requirement that the Examining Attorney demonstrate that the surname is not rare. The issue to be determined under the statute is whether the public would perceive the surname significance as the proposed mark's primary significance, not whether the surname is rarely encountered. The statute does not say "primarily merely a common or well-known surname," or words to that effect. As the Board recently noted in *In re Eximius Coffee, LLC*, "even a rare surname is unregistrable if its primary significance to purchasers is a surname." 120 USPQ2d 1276, 1281 (TTAB 2016). Thus, evidence that some individuals actually bear the surname ADLON necessarily supports the proposition that this term would be perceived as a surname, although a surname's rareness may be relevant to determining whether the primary significance of the mark as a whole to the purchasing public is that of a surname. As the Dissent notes, evidence of persons bearing the surname who are "of sufficient notoriety to impact consumers in a meaningful way" is one type of evidence that may give increased weight to a showing of only rare surname usage. Evidence of an alternative perceived meaning (which may include the perception of the mark as a coined term) produced by an applicant must also be considered in resolving the ultimate question on the merits. However, the degree of a surname's rareness is not dispositive of the amount or kind of evidence the entire record must contain to establish that the mark's primary significance to the purchasing public is that of a surname; the amount or

---

[28] *Id*. at 12, 29 TTABVUE 17.

kind of evidence necessary to demonstrate that the term is "primarily merely" a surname will vary on a case-by-case basis.

As noted, the evidence relied on by the Examining Attorney indisputably demonstrates that ADLON is an actual surname, and it further creates the strong inference that the term has no other meaning. The evidence showing ways in which the public has been exposed to the use of ADLON as a surname of particular people further indicates that the primary and only significance of ADLON to which the public has been exposed is surname significance. In the face of that evidence Applicant's main contention is that "the consumer would perceive the mark as indicating Applicant itself, Adlon Brand GmbH & Co. KG and/or the Hotel Adlon, and the source of its goods/services …"[29] Applicant argues that it "owns the trademark rights in the Hotel ADLON in Berlin. Moreover, Applicant belongs to a group of companies which was associated with its rebuilding."[30] The Examining Attorney contends that this argument is a disguised claim that Applicant's mark has acquired distinctiveness.[31] Applicant denies this and insists that its argument is something else:

> Applicant is not arguing acquired distinctiveness but is explaining that the lack of current association [of Applicant] with an individual with the surname ADLON, which has been "replaced" by a different association with a hotel, further confirms that this factor weighs in favor of registration. Applicant contends that the ADLON mark

---

[29] Applicant's brief at 1, 14, 29TTABVUE 6, 19.
[30] *Id.* at 13, 29 TTABVUE 18.
[31] Examining Attorney's brief, 31 TTABVUE 13.

> has meaning as the source of its goods/services and would be perceived as such by the consumer …[32]

The last sentence quoted above certainly *looks* like a claim of acquired distinctiveness (*i.e.*, a claim that the mark "has become distinctive of the applicant's goods in commerce" under 15 U.S.C. § 1052(f)). However, the facts before us are inconsistent with such a claim, because Section 2(f) is limited by its terms to "a mark used by the applicant," and Applicant does not claim to have ever used its mark in the United States or in another form of commerce that may be regulated by the U.S. Congress. *See* 15 U.S.C. § 1127, definition of "commerce."[33] *See also In re Cazes*, 21 USPQ2d 1796, 1797 (TTAB 1992) ("without a formal claim of distinctiveness under [Section 2(f)], evidence of fame cannot serve as the basis for allowing registration of applicant's mark.").

Applicant appears to argue, in part, that the primary meaning of ADLON in the public's perception is to designate the historic Hotel Adlon in Berlin. Applicant has submitted the Wikipedia entry for "Hotel Adlon,"[34] which states that "The legendary original Hotel Adlon was one of the most famous hotels in Europe. It opened in 1907 and was largely destroyed in 1945 in the closing days of World War II, though a small

---

[32] Applicant's reply brief at 2-3, 32 TTABVUE 6-7.

[33] It bears noting that the USPTO has a longstanding practice of allowing registration of surnames under Section 2(f) upon a showing of substantially exclusive and continuous use of the name as a mark in regulable commerce for five years and of the applicant's belief that such use has caused the mark to become distinctive of its goods. Surnames that have been used for a lesser period of time may also be registered on the Supplemental Register and, after five years of use have transpired, the user may seek registration on the Principal Register. In view of these relatively easy routes to registration, it is sometimes puzzling that applicants who have commenced use of surname marks prefer to wage a pitched battle to make the much more difficult showing that a term is not primarily merely a surname.

[34] Applicant's response of May 14, 2014 at 9-14.

11

wing continued operating until 1984." The Wikipedia entry describes the hotel as "the social center of Berlin" from its early days and "throughout the Nazi period."[35] According to the entry, the hotel was rebuilt on the same site and now operates as Hotel Adlon Kempinski Berlin.[36] The entry also notes that the original hotel was started by Lorenz Adlon, was later managed by his son Louis Adlon "with his American-born wife Hedda," and was the subject of a documentary film entitled *The Glamorous World of the Adlon Hotel* made by his great-grandson Percy Adlon and of a mini-series entitled *Das Adlon: Eine Familiensaga (The Adlon: A Family Saga)*."[37] Applicant has also submitted the results of a search of the IMDb database for "the adlon hotel,"[38] which revealed a 1955 film entitled *Hotel Adlon*, the TV movie entitled *The Glamorous World of the Adlon Hotel* (mentioned above), another entitled *Adlon verpflichtet – Geschichte und Geschichten eines Hotels*, a TV episode entitled *Schloss Charlottenburg-Hotel Adlon*, and the TV mini-series entitled *Das Adlon: Eine Familiensaga* (mentioned above). Applicant has provided no additional information regarding these films. This evidence is obviously problematic for purposes of demonstrating that the primary meaning of ADLON is not that of a surname, because it clearly indicates that the hotel was named ADLON because that was the surname of its founder, and was subsequently held out as a family operation. It is interlaced with references to persons bearing the surname ADLON who were involved in

---

[35] *Id*. at 9-10.

[36] *Id*. at 10.

[37] *Id*. at 9-10, 12.

[38] *Id*. at 24-25. The same search reveals the names of five persons bearing the surname Adlon: Pamela, Gideon, Percy, Felix O., and Eleonore.

founding, managing, or promoting the hotel. Rather than persuade us that the Hotel Adlon is so historically prominent that the hotel significance of ADLON has supplanted the surname significance, this evidence shows the term ADLON used in a context that actually suggests that the term is a surname.

The Dissent argues that the history of the Hotel Adlon is of no probative value, primarily because it is unlikely to be known to United States consumers. However, much history that transpired outside the United States is known to the American public, and Applicant is entitled to advance the proposition – and seek to prove – that such history has an impact on the way that the public will perceive the meaning of its mark. We have considered Applicant's historic evidence but find it inherently conflicting and insufficient to counter the evidence showing that the surname significance of ADLON is the primary significance of ADLON to the purchasing public. The evidence focuses as much, or more, on the Adlon family as it does on the ADLON hotel. The evidence does not focus primarily on the hotel and only in passing on the family surname.

In an apparent effort to show that the primary significance of the mark is the *contemporary* Hotel Adlon Kempinski, Applicant has submitted an entry for the Hotel Adlon Kempinski from <tripadvisor.com>, indicating that it is "Ranked # 16 of 667 hotels in Berlin," and setting forth excerpts from 11 reviews by travelers. While the travelers obviously understand ADLON to be part of the name or mark of the hotel, the reviews do not reveal their impressions as to whether ADLON is a surname, a word, or a coined term. Applicant has also submitted results of a search of the website

13

of the United States Diplomatic Mission;[39] the results are fragments of 10 entries that make reference to "Hotel Adlon," "Hotel Adlon Berlin," or "Hotel Adlon Kempinski Berlin." These fragments appear to describe various events that took place at the hotel. This is supplemented by a transcript of remarks made at the 2004 groundbreaking for the new U.S. embassy in Berlin by a representative of the U.S. Department of State;[40] the remarks make reference to assistance from "The Adlon Hotel." Neither this evidence nor the evidence from <tripadvisor.com> shows that this foreign hotel is so prominent that its name has supplanted the surname significance of the term ADLON standing alone.[41]

In arguing that the meaning of the mark ADLON is "a hotel" or "the source of [Applicant's] goods/services,"[42] it is not clear whether Applicant intended to argue that the public would perceive the mark as a coined term having no meaning other than as a trademark. If that is Applicant's contention, we do not find the above evidence sufficient to prove it. The fact that a designation has been recognized as a trademark for particular goods or services (whether of the applicant or of a third party) does not imply that customers have ceased to perceive any other meaning in it. Trademark law (both statutory and common law) extensively contemplates that functioning trademarks may have descriptive or suggestive meanings, geographic meanings, surname meanings, or personal name meanings, all of which may be

---

[39] Applicant's response of May 14, 2014 at 22-23.

[40] *Id.* at 26-28.

[41] As previously noted, we are not, in this decision, discussing acquired distinctiveness, which has not been alleged. Such a claim may be the subject of another application, under the appropriate circumstances.

[42] Applicant's reply brief at 2-3, 32 TTABVUE 6-7.

appreciated by customers even though they primarily understand the mark to be source-indicating. In order to show that the public would perceive a proposed mark as a coinage, in the face of evidence establishing that the mark is a surname with no other recognized meaning, some objective countervailing evidence of such a perception is required.

For the same reason we find ineffective the proffered copies of three expired or cancelled third-party registrations of the mark ADLON,[43] which, according to Applicant, "show the consumer would not perceive ADLON as a surname."[44] The prosecution records underlying these registrations are not of record; accordingly, the registrations provide little or no insight into why they issued. They reveal little to nothing about the public's perception or understanding of the term ADLON. We add that prior decisions and actions of other trademark examining attorneys in registering other marks have little evidentiary value and are not binding. *See In re Nett Designs, Inc.*, 236 F.3d 1339, 1342, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001). And the fact that the registrations are cancelled further reduces their evidentiary value. *Cf. Action Temporary Servs. Inc. v. Labor Force Inc.*, 870 F.2d 1563, 10 USPQ2d 1307, 1309 (Fed. Cir. 1989) ("[A] cancelled registration does not provide constructive notice of anything.")

Applicant also submitted one page of information regarding what was apparently an apartment building in New York City called The Adlon.[45] Without more, the fact

---

[43] Response of October 23, 2013 at 16-19.
[44] Applicant's brief at 13, 29 TTABVUE 18.
[45] Response of May 14, 2014 at 15.

that another entity may have used ADLON as the name of a building or as a trademark does not reveal what meaning the public may have associated with that term.

Applicant and the Examining Attorney have both raised other arguments that, in this case, carry little weight in view of the evidence of record. Applicant argues that "no one with the name 'Adlon' is connected with the Applicant."[46] The apparent absence of a person named ADLON in Applicant's current management does not, in itself, reduce the likelihood that the public would perceive the mark as a surname. By contrast, if a person named ADLON were associated with the business and that association were promoted to the public, it would enhance the public's perception of the term as a surname. *See In re Integrated Embedded*, 120 USPQ2d 1504, 1507 (TTAB 2016) (where promotional materials of applicant promoted the credentials and accomplishments of its founder Mr. Barr, this reinforced the likely public perception of BARR as a surname.)

The Examining Attorney argues that ADLON has the structure and pronunciation of a surname, comparing the mark to other purported surnames that have two syllables and end in –LON or –ON, like Dillon, Kaplon, Hanlon, Yelon, Ablon, Scanlon, Fallon, Kellon, Freelon, Nealon, Allon, Millon, Kallon, Donlon, Carlon, Dalton, Wilson, Acton, and Burton.[47] This argument is unpersuasive. With the possible exception of Ablon and Allon, which differ from ADLON by one letter, the

---

[46] Applicant's brief sat 13, 29 TTABVUE 18.
[47] Examining Attorney's brief, 31 TTABVUE 9-10. *See* Office Action of May 15, 2013 at 26-37; Office Action of November 14, 2013 at 110-168; Office Action of June 8, 2014 at 80-115.

surnames cited are not highly similar in structure to ADLON. The mere sharing of a prefix, suffix or letter string does not result in the sort of structural similarity that is helpful to our analysis. Moreover, evidence showing that the surnames cited are similar in sound is lacking. As the Dissent notes, arguments regarding the structure and sound of surnames are frequently highly subjective in nature. *See In re Benthin*, 37 USPQ2d at 1333 (structure and pronunciation factor "is decidedly subjective in nature."). With respect to this difficult type of argument, we would require more objective evidence, whether from Applicant or the Examining Attorney, of how members of the public would perceive the structure and sound of ADLON and whether they would be likely to perceive it as similar to the structure and sound of other surnames, common words or coined terms.

Examining the entire record to determine the primary significance of the term ADLON, we find that the Examining Attorney has demonstrated that ADLON is a surname that is in use in the United States, that the public has been exposed to and discussed ADLON as a surname, and that the term ADLON has no other "ordinary language meaning." We further find that Applicant has failed to demonstrate that the term has another significance that is its primary significance as perceived by the public. We find, therefore, that ADLON is primarily merely a surname and that the refusal to register the mark must be affirmed.

2.     Applicant's request for remand.

Applicant, in its brief, states that the Examining Attorney, in her Office Action in response to Applicant's request for reconsideration, "presented a new issue based on

17

significantly different evidence …" and that "in the event the Board is not persuaded to reverse the final refusal, remand is appropriate to provide the Applicant with an opportunity to respond to the new evidence and basis for rejection."[48] Applicant's rationale is that the Examining Attorney, on reconsideration, introduced evidence and arguments regarding surnames ending in –LON;[49] whereas earlier she had referred to surnames ending in –ON.[50] Applicant, citing Trademark Manual of Examining Procedure ("TMEP") § 715.03, contends that the Examining Attorney erred by not issuing a "Subsequent Final Refusal" that would allow Applicant a six-month response period.

Applicant's reliance on TMEP § 715.03 is misplaced. Applicant filed its request for reconsideration on the same day that it filed its notice of appeal.[51] Where an appeal has already been filed, the applicable procedure for examining a request for reconsideration that presents new evidence (as Applicant's did) but does not raise a new issue is set forth in TMEP § 715.04(b). In that situation, "the examining attorney must issue an 'Examiner's Subsequent Final Refusal,' *that omits the six month response clause*, … and addresses the new evidence …" (emphasis added).[52] Neither Applicant's new evidence and arguments regarding the outstanding refusal under Section 2(e)(4), submitted with its request for reconsideration, nor the Examining Attorney's submission of additional evidence regarding the same refusal, provided in

---

[48] Applicant's brief at 4, 29 TTABVUE 9.

[49] Office Action of June 8, 2014 at 4.

[50] *See* Office Actions of May 15, 2013 and November 14, 2013.

[51] 1 and 4 TTABVUE, both filed May 14, 2014.

[52] The same provision expressly provides that "The examining attorney may also introduce additional evidence directed to the new evidence submitted by the applicant."

response to that request, raised a new issue such as to make appropriate a *nonfinal* Office Action that would have allowed a six-month response period. *See* TMEP §§ 714.05(a)-(f); *see also* TMEP §§ 714.03, 706; and TBMP § 1204 (2016). *Cf. In re Jimmy Moore LLC*, 119 USPQ2d 1764, 1767 n.3 (TTAB 2016). In any event, Applicant's brief on the case is not the appropriate avenue for raising an objection to examination procedures. If Applicant believed that the issuance of the June 8, 2014 Office Action was procedurally erroneous, or if Applicant desired more time to address the Examining Attorney's new evidence, Applicant's recourse was to file with the Board, after the filing of the appeal but before briefing, a request for remand with a showing of good cause. *See* TBMP §§ 1207.02, 1209.04. Applicant did not invoke this procedure or make this showing. Accordingly, the request for remand included in Applicant's brief is denied.

We also point out that Applicant cannot, in effect, make a request for remand conditional on the outcome of the Board's decision in the appeal, *i.e.*, to request, in the event that the Board affirms the refusal, that the application be remanded so that Applicant may submit additional evidence.[53] *See* Trademark Rule 2.142(g), 37 C.F.R. § 2.142(g) ("An application which has been considered and decided on appeal will not be reopened except for the entry of a disclaimer… or upon order of the Director….").

---

[53] Although Applicant states that its conditional request for remand would be to provide Applicant an opportunity to respond to the new evidence and basis for rejection, we presume that the request would have been to present countering evidence, since Applicant could have responded by argument in its brief.

**Decision:** The refusal to register is affirmed on the ground that Applicant's mark is primarily merely a surname within the meaning of Trademark Act Section 2(e)(4).

**Quinn, Administrative Trademark Judge, dissenting.**

I respectfully dissent from the majority's decision to affirm the surname refusal.

At the outset, I recognize that the evidence bearing on whether or not ADLON is primarily merely a surname must be viewed through the filter of consumer perception of the term sought to be registered. "When [a term] is used in trade it must have some impact upon the purchasing public, and it is that impact or impression which should be evaluated in determining whether or not the primary significance of a word when applied to a product is a surname significance. If it is, *and it is only that*, then it is primarily merely a surname." *In re Hutchinson Technology Inc.*, 852 F.2d 552, 7 USPQ2d 1490, 1492 (Fed. Cir. 1988) (emphasis in original) (citations omitted). ADLON is a surname. But, I find that the record fails to establish that ADLON is "primarily merely a surname" as contemplated by Section 2(e)(4).[54]

I appreciate that the statute does not mention rareness, and makes no distinction between rare and common surnames; nevertheless, our primary reviewing court makes it clear, as indicated above, that we must consider consumer perception in determining if the term should be considered to be a surname precluded from

---

[54] According to Edward S. Rogers, a primary drafter and proponent of the Lanham Act, the word "primarily" was added to the surname section to "prevent a refusal to register only because a surname was found in a directory to be the name of somebody somewhere." Hearings on H.R. 4744, 76th Cong., 1st Sess., pp. 39-41. *See also In re Garan, Inc.,* 3 USPQ2d 1537, 1539 (TTAB 1987) citing *Ex parte Rivera Watch Corp.,* 106 USPQ 145, 149 nn. 3, 5, 7 (Comm'r of Patents 1955).

registration as an inherently distinctive mark. I am of the view that the extreme rareness of a surname may provide some insight into the perception of it by consumers. "That the degree of rareness of a surname is material to our determination is corroborated by the legislative history." *In re Garan*, 3 USPQ2d at 1540 n.12. *See generally* R. Jacobs, "Recapturing Rareness: the Significance of Surname Rareness in Trademark Registration Determinations," 50 IDEA: *The Intellectual Property Law Review* 395, 414-415 (2010).

In the present case, the evidence reveals approximately 75 individuals with the surname ADLON. I also note TMEP § 1211.02(b)(iii) (2016) states the following:

> The Census Bureau (http://www.census.gov/topics/population/genealogy/data/2000_surnames.html) has a database of surnames taken from the most recent decennial census. The surnames are ordered by rank, and the database lists the number of individuals in the country having each surname. Because the database reflects the number of individuals, rather than the number of households, with a particular name, search results from this database may be more persuasive evidence of surname frequency than results from telephone directory listings.

In this connection, the Board may take judicial notice of census data. *In re Tokutake Indus. Co.*, 87 USPQ2d 1697, 1700 n.1 (TTAB 2008). Information retrieved from the website of the U.S. Census Bureau shows a listing of surnames occurring 100 or more times in the most recent census; ADLON does not appear on the list. Further, in the vast arena that is known as "social media" (in this case, Facebook, Twitter, and LinkedIn), the record contains a mere 8 examples of ADLON used as a surname.[55]

---

[55] Modern technology surely has impacted the analysis in this area of the law in the time period since the most "recent" surname decision of the Federal Circuit in the *Hutchinson Technology* case, which now dates back almost three decades. The USPTO now can take into

Accordingly, considering the huge size of the databases from which this evidence is drawn, ADLON is, at the very least, an extremely rare surname.

Our ultimate surname analysis and determination must be based on all of the evidence considered as a whole. When faced with the fact that there are only 75 individuals with the surname ADLON, the Examining Attorney introduced additional probative evidence directly bearing on consumer perception, in this case media attention given to individuals with the surname ADLON. The problem for me is that given the extreme rareness of the surname, the evidence of media attention given to a single actress best known for her performance as the voice of an animated character falls short of showing that consumers would perceive the primary significance of ADLON as a surname. With only 75 individuals in the entire United States having the surname ADLON (and only 8 references to individuals found on social media), and no others with the surname of sufficient notoriety to impact consumers in a meaningful way, I simply cannot conclude that the public will view the mark as a surname because its exposure to the surname use is so limited. That is, the extreme rarity of the surname ADLON, coupled with the lack of a sufficient degree of media exposure of the term as a surname, strongly suggests that few consumers would know, or know of, a person named ADLON.

---

account, during examination, vast electronic databases of nationwide listings of individuals, as well as websites and social media, all of which supply more expansive, accurate, and complete information, thereby providing a better indication of how the purchasing public will understand a term. The availability of these computer databases provides information, as shown in the present case, upon which the Examining Attorney and the Board can rely to determine whether a term is truly a rare surname such that the primary significance to consumers is not that of a surname.

The extreme rareness of a surname indicates to me that consumers are less likely to view the term as a surname. In the present case we must determine, based on the evidentiary record, whether the surname significance dominates consumer understanding of the term. I appreciate that even a rare surname may be held primarily merely a surname if its primary significance to purchasers is that of a surname. Some surnames have only surname significance, and consumers recognize them as surnames despite their rarity. One significant reason may be contextual clues that identify the term as a surname to consumers. Another reason for consumer recognition of a rare surname is that media publicity for those who have the surname makes the surname significance well-known so that consumers regard the surname significance as primary. *See In re Gregory*, 70 USPQ2d 1792, 1795 (TTAB 2004) ("[Rogan] may be rare when viewed in terms of frequency of use as a surname in the general population, but not at all rare when viewed as a name repeated in the media and in terms of public perception.").

With respect to contextual use, in the present case, it is significant that there are absolutely no contextual clues that identify the term as a surname to consumers.[56] When an unfamiliar term is first encountered, the consumer often learns its meaning through context. Here there is nothing to show any contextual use that would make ADLON more likely to be perceived as a surname than as a coined or unknown term. Thus, the present case is clearly distinguishable from *In re Etablissements Darty et Fils*, 759 F.2d 15, 225 USPQ 652, 653 (Fed. Cir. 1985), on which the majority relies.

---

[56] In saying this, while I understand that the present application is based on an intention to use the mark, the evidence includes examples of the mark in actual use.

In that case, the Court observed that DARTY was "used in the company name in a manner which reveals its surname significance (Darty et Fils translates as Darty and Son)," highlighting that "[t]his, *in itself*, is highly persuasive that the public would perceive DARTY as a surname." *Id.* at 653 (emphasis added). Such contextual clues are entirely absent from Applicant's mark as actually used. *Cf. In re Eximius Coffee, LLC,* 120 USPQ2d 1276 (TTAB 2016) (where the surname of those associated with the applicant was ALDECOA and the product was promoted as "premium family coffee," this reinforced the surname significance of ALDECOA); *In re Integrated Embedded,* 120 USPQ2d 1504 (TTAB 2016) (the name of applicant's co-founder and officer, Michael Barr, is prominently featured several times on applicant's website, serving to reinforce the primary significance of BARR as a surname in the proposed mark BARR GROUP); *In re Luis Caballero, S.A.*, 223 USPQ 355 (TTAB 1984) (notwithstanding a "paucity" of telephone directory listings, surname refusal affirmed in view of specimen labels in the record showing use of the name John William Burdon (from which Applicant admitted the mark BURDONS was derived) as producer of the identified goods).

Insofar as media publicity for those who have the surname ADLON is concerned, the majority places significant reliance on the notoriety of the entertainer Pamela Adlon. Ms. Adlon did not take her last name until 1996, when at the age of thirty she married Felix Adlon. Ms. Adlon's notoriety stems mainly from her voice work, in particular as the voice of Bobby Hill on *King of the Hill* for which she won an Emmy Award in 2002 for Outstanding Voice-Over Performance. In the words of the majority,

Ms. Adlon "has achieved a substantial degree of public recognition for her performances" in television shows. Being best known for voice work for an animated character, as opposed to live-action roles, hardly puts Ms. Adlon in a category of well-known entertainers. It may be that Ms. Adlon has enjoyed a successful career and made a name for herself in the entertainment industry, but I have my doubts, based on the present evidentiary record, about her notoriety among the public at large, with whom we need to be concerned in deciding this issue. If anything, Ms. Adlon has niche notoriety, which makes it unlikely that the degree of media coverage of her has made a meaningful impact on the consuming public's awareness of the surname significance of ADLON. Further, the other Adlons in the entertainment industry listed by the majority are hardly household Hollywood names likely to be known by consumers; none of these individuals appears to enjoy particular notoriety such as might apprise the consuming public of the surname significance of ADLON.

Based on the record, I find that consumers would not think of the extremely rare surname ADLON primarily merely as a surname because they are highly unlikely to have encountered it as such, but rather would regard the term as being a coined term or unknown term with an unknown meaning. Simply stated, I find it probable that consumers will not understand the surname significance of a term they likely have never previously encountered as a surname. When a consumer lacks familiarity with a term, as I find the case to be herein, the consumer would not regard that term as having a meaning as a surname *merely because a surname significance exists*. The consumer lacks familiarity both with the term and the surname significance, and the

consumer is unlikely to give the term a meaning not known to exist, that is, that of a rare surname. Consumers unaware of the term ADLON and its meaning would not speculate and think of it as a surname. Rather, I think it just as likely (or even more likely) that a consumer will consider the extremely rare surname to be a term whose meaning is unknown, that is, as a fanciful or arbitrary term, rather than as a surname.

So as to be clear, I do not advocate a test that the primary significance of a term be based solely on a threshold or "magic" number of individuals having the surname, in main part because I do not believe that such numbers by themselves convey how consumers perceive the term. As stated earlier, a rare surname nevertheless may receive a significant degree of exposure due to the notoriety of someone with the surname, thereby causing consumers to primarily recognize the surname as such; or there may be contextual clues about the surname significance. But, I do not believe that is the case with ADLON.

I concur with the majority that the Examining Attorney's reliance on the structure and pronunciation of terms asserted to be similar to ADLON is not persuasive for the reasons ably advanced by my colleagues.[57] This "factor" is highly subjective and, in

---

[57] Further, although the Examining Attorney equated ADLON with similar surnames, I think it more likely, given the extreme rarity of ADLON as a surname, that consumers would view it as they would similar coined terms or brands found in the dictionary, such as "nylon," "Orlon," "Teflon" and "Ban-lon." (merriam-webster.com; collinsdictionary.com). The Board may take judicial notice of dictionary definitions, *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), including online dictionaries that exist in printed format or have regular fixed editions. *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377 (TTAB 2006). *See In re Thomas White Int'l Ltd.*, 106 USPQ2d 1158, 1160 n.1 (TTAB 2013).

this case, the other "similar" surnames may be just as extremely rare as ADLON, thereby adding little to the likelihood that consumers will ascribe a surname meaning to the term. *See Eximius Coffee*, 120 USPQ2d at 1280 (reference to purported surnames "without proving that they are surnames, without showing how common such surnames with the suffix "OA" are, and without providing some other objective evidence of how members of the public perceive the structure and sound of ALDECOA is not sufficient to enable us to determine that ALDECOA has a structure and pronunciation similar to that of other purportedly common surnames").

The evidence also includes copies of three expired or cancelled registrations of the mark ADLON, with the majority noting that "they reveal little to nothing about the public's perception or understanding of the term ADLON." Nevertheless, this evidence does show, at the very least, that the prior Examining Attorneys, who presumably were sensitive to the surname issue, did not view ADLON as primarily merely a surname, but rather as an inherently distinctive, source-indicating mark.

One additional point is in order in response to the majority. The majority points to the history of the Hotel Adlon in Berlin, stating they are not persuaded "that the Hotel Adlon is so historically prominent that the hotel significance of ADLON has supplanted the surname significance." I agree. Simply put, most consumers in the United States are unlikely to know of a single hotel in Berlin, Germany (where the original was largely destroyed in 1945 in the closing days of World War II, was completely demolished in 1952 by the East Germans, and the existing hotel was not opened until 1997 by the Kempinski hotel chain under the name Hotel Adlon

27

Kempinski). The majority also makes reference to the Adlon family's involvement with the hotel, pointing out that the evidence on this point is interlaced with references to persons named Adlon who were involved in founding, managing, or promoting the hotel. Indeed, the original hotel was founded by Lorenz Adlon and later managed by his son Louis Adlon. My view is that American consumers are even less likely to know the name Lorenz Adlon (who died 95 years ago in 1921) as the hotel's founder (or any of the other Adlon family members) than they are to know the hotel itself. Thus, I suggest that this portion of the record plays a minimal role in the surname analysis. As the Federal Circuit has observed:

> The internet (and websites such as Wikipedia) contains enormous amounts of information: some of it is generally known, and some of it is not. There is simply no evidence that the relevant American consumer would have any meaningful knowledge of all of the locations mentioned in the websites cited by the PTO. Further, it is simply untenable that any information available on the internet should be considered known to the relevant public. The fact that potential purchasers have enormous amounts of information instantly available through the internet does not evidence the extent to which consumers of certain goods or services in the United States might use this information to discern the primary significance of any particular term.

*In re Newbridge Cutlery Co.*, 776 F.3d 854, 113 USPQ2d 1445, 1450 (Fed. Cir. 2015).

Based on the evidentiary record showing that ADLON is an extremely rare surname, with limited public exposure of the term ADLON as a surname and no contextual clues in the way Applicant actually uses the term, I find that the record falls short of showing by substantial evidence that ADLON is primarily merely a surname. Rather, I conclude that consumers would be unlikely to perceive ADLON

as a surname and would instead perceive it as a fanciful, coined term having no specific meaning. Because of the extreme rarity of ADLON as a surname, and the relative lack of notoriety of Pamela Adlon (and others) outside of the entertainment industry, I would reverse the refusal to register. To the extent that the lack of substantial evidence casts doubts on whether or not the primary significance of a word when applied to Applicant's goods and services is a surname significance (not to mention that the Office in the past registered ADLON as an inherently distinctive mark), that doubt must be resolved in favor of Applicant, and the mark published for opposition. *See In re Joint-Stock Co. "Baik*," 84 USPQ2d 1921, 1924 (TTAB 2007).

Accordingly, I would reverse the refusal to register.